IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KIM J. MALONE, | ) | Case No. 1:16-cv-1084 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.      Introduction

Plaintiff Kim J. Malone seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and XVI of the Social Security Act ("Act"). This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

Because substantial evidence supported the Commissioner's disposition of plaintiff's application and because there was no error of law in the proceedings before the Commissioner, I recommend that the final decision of the Commissioner be AFFIRMED.

## II.      Procedural History

Plaintiff applied for DIB and SSI on June 22, 2011.  (Tr. 285, 292)  Ms. Malone alleged that her disability began on November 6, 2010.  (Tr. 285)  Plaintiff's applications were denied

initially and after reconsideration. (Tr. 163, 169, 177, 183) On December 9, 2011, Ms. Malone requested an administrative hearing. (Tr. 188)

Plaintiff appeared without counsel for a hearing on January 14, 2012, but the Administrative Law Judge Peter R. Bronson ("ALJ") postponed the hearing after Ms. Malone said she wanted representation. (Tr. 51-65) The rescheduled occurred on March 18, 2013 and plaintiff appeared with counsel. (Tr. 67) The ALJ ordered a psychological evaluation after. (Tr. 734-740) The ALJ denied plaintiff's applications for benefits on August 19, 2014. (Tr. 22)

In a letter dated September 4, 2014, plaintiff's attorney requested that the ALJ reopen his decision and reconsider his analysis of plaintiff's IQ scores. (Tr. 280-281) The ALJ denied this request. (Tr. 282) Plaintiff's counsel submitted a second letter further explaining plaintiff's position on September 16, 2014. (Tr. 283-84) Plaintiff requested review of the ALJ's decision on October 17, 2014. (Tr. 19-20) The appeals council denied review in a decision dated March 7, 2016 (Tr. 1), rendering the ALJ's decision the final decision of the Commissioner.

## III. Evidence

### A. Personal, Educational and Vocational Evidence

Ms. Malone was 44 years old when her disability allegedly began and had turned 48 by the time of the hearing. (Tr. 72, 117) Ms. Malone completed high school through a special education program. (Tr. 73) During her life, she worked as a laundry worker, a housekeeper in a nursing home, a cashier, a laborer, and a stocker. (Tr. 363) Her work history was limited to mostly part-time employment. (Tr. 73-75)

### B. Medical Records Related to Mental Impairments

Plaintiff was evaluated for special education services in 1977 when she transferred to a new school at age ten. (Tr. 404) Her scores on the Wechsler Intelligence Scale for Children

(WISC) were 71 for verbal IQ, 72 for performance IQ, and 69 for full scale IQ. (Tr. 404) Plaintiff was placed in special education programming and graduated in 1985. (Tr. 403)

After the administrative hearing, the ALJ sent Ms. Malone for a consultative psychological examination with Thomas Zeck, Ph.D. (Tr. 415) Dr. Zeck administered the Wechsler Adult Intelligence Scale – IV test. ("WAIS-IV") Plaintiff scored 68 on verbal comprehension (2nd percentile), 82 on perceptual reasoning (12th percentile), 74 on working memory (4th percentile), 81 on processing speed (10th percentile), and her full scale IQ score was 72 (3rd percentile). Dr. Zeck also administered the Wechsler Memory Scale IV test. ("WMS-IV") Plaintiff was in the 27th percentile for auditory memory, the 5th percentile for visual memory, the 9th percentile for visual working memory, the 5th percentile for immediate memory, and the 21st percentile for delayed memory. (Tr. 738)

Dr. Zeck diagnosed depressive disorder NOS and borderline intellectual functioning ("BIF") and assigned a GAF score of 55. (Tr. 738-39) He felt that she would have difficulty in carrying out complex instructions but that she would be able to do simple tasks that could be helpful to an employer. (Tr. 739) Dr. Zeck noted that attention and concentration were not problem areas for her though she did struggle with rote memory and immediate recall. (Tr. 739) He also opined that she would have the ability to appropriately react to supervisors and co-workers. (Tr. 739)

### C.    Medical Records Related to Physical Impairments

Plaintiff presented no treating source evidence from providers who saw her on a regular basis. Probably because of her lack of health insurance, most of her health care came in emergency room visits. (Tr. 85, 89)

Plaintiff sought treatment at an emergency room in February 2010 for pain and numbness in her forearms and wrists. (Tr. 538-544) She had tenderness and limited range of motion in both wrists and was diagnosed with carpal tunnel syndrome. (Tr. 539, 544) Treatment included a steroid injection, pain medication and a splint. (Tr. 544) She sought treatment for her left wrist and her lower back in May 2010. (Tr. 504) She was diagnosed with De Quervain's syndrome. (Tr. 504)

Orthopedic surgeon, Mark Tenholder, M.D., examined plaintiff on September 8, 2010, prior to the alleged disability onset date. (Tr. 563) Plaintiff reported that she was right handed and had been experiencing left shoulder pain for two to three months. (Tr. 563) Plaintiff also reported that she had been experiencing similar right shoulder pain but that it had "resolved spontaneously." (Tr. 563) Dr. Tenholder noted that plaintiff's left shoulder had limited rotation and was tender over the AC joint. (Tr. 563) He also noted that there was a large soft tissue envelope but no crepitation or pain through her range of motion. (Tr. 563) Dr. Tenholder reviewed x-rays of plaintiff's shoulder and diagnosed left shoulder rotator cuff bursitis with a small acromial tear and chronic back pain. (Tr. 563) He prescribed medicine and referred plaintiff to physical therapy through vocational rehabilitation. (Tr. 563) He also discussed a cortisone injection with plaintiff but she declined because these injections had not helped in the past. (Tr. 563) The record contains no evidence that plaintiff was able to follow through and obtain the prescribed physical therapy.

Plaintiff sought treatment at an emergency room in August 2010 for leg swelling. (Tr. 634) She was found to have a normal joint range of motion with no swelling or deformities. (Tr. 635) A chest x-ray showed that her heart was "borderline in size" but her pulmonary vascularity

was normal.  (Tr. 639)  The results of her exam and testing revealed no acute cardiopulmonary disease.  (Tr. 639)  Plaintiff was diagnosed with acute bronchitis.  (Tr. 635)

On December 15, 2010, plaintiff returned to the emergency room with complaints of left shoulder pain.  (Tr. 630)  She said her shoulder pain was chronic and that she had been seen by an orthopedic doctor for a rotator cuff tear and was waiting for physical therapy and further treatment.  (Tr. 630)  Plaintiff's shoulder range of motion was decreased and there was severe tenderness to palpation.  (Tr. 631)  The attending physician diagnosed osteoarthritis pain and acute bursitis and prescribed pain medication.  (Tr. 631)

In May 2011, plaintiff sought treatment in the emergency department for acute exacerbation of chronic low back pain.  (Tr. 589)  The attending physician prescribed medication and advised her to follow-up with her primary care physician.  (Tr. 596)  Plaintiff returned to the emergency department again on June 15, 2011.  (Tr. 572)  She was again diagnosed with chronic back pain, prescribed narcotic medication and discharged.  (Tr. 596)

In August 2011, plaintiff returned to the emergency department complaining of back pain.  (Tr. 626)  Plaintiff was diagnosed with acute muscular spasm, radiculopathy, acute sciatica, and degenerative disc disease.  (Tr. 628)  The attending physician prescribed medication and told plaintiff to follow-up with her primary care doctor.  (Tr. 628)  In October 2011, an x-ray of plaintiff's lumbar spine revealed spondylosis at T11-12, but an otherwise normal lumbar spine impression.  (Tr. 656)

In January 2013, plaintiff returned to the emergency room for lower back pain and was prescribed pain medication.  (Tr. 704)  In February 2013, x-rays of plaintiff's lumbosacral spine showed no compression deformity or subluxation and mild multilevel spondylosis.  (Tr. 729)

### D. Opinion Evidence

#### 1. Consulting Examiner, Maria Elena Rodriquez, M.D. – October 2011

Dr. Maria Elena Rodriquez conducted a physical exam of plaintiff in October 2011. (Tr. 658-661) Dr. Rodriquez noted that plaintiff was limping a "little bit" on her left leg, but otherwise her ambulation was normal. (Tr. 660) Plaintiff's right grip was 4 out of 5 and her left grip was 3 out of 5. (Tr. 660) Plaintiff had decreased range of motion of both shoulders. (Tr. 660) Dr. Rodriquez noted that the results of the shoulder and knee range of motion examination were "very significant" and she opined that plaintiff had a "severe functional limitation" with her shoulder. (Tr. 661) Dr. Rodriquez felt that plaintiff's knee problems caused a moderate functional limitation. (Tr. 661)

#### 2. Non-Examining State Agency Medical Consultants

##### a. Tonya Morris Spears, M.D. – July 2011

Non-examining state reviewing physician, Tonya Morris Spears, M.D., reviewed plaintiff's records on July 11, 2011. (Tr. 117-122) Dr. Spears opined that plaintiff retained the RFC to perform light-range work; that she could stand, sit or walk for 6 hours in an 8-hour workday; and had no limitations for pushing or pulling. (Tr. 121-122) She also noted that plaintiff was grossly obese and that an x-ray had shown moderate arthritis and a small subacromial spur on her left shoulder. (Tr. 122) Despite these notes, she opined that plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 122)

##### b. Louise Wunsch, M.D. – September 2011

Louise Wunsch, M.D., reviewed plaintiff's files on reconsideration. (Tr. 139-143) Dr. Wunsch opined that plaintiff had the RFC to perform light-range work and that she could stand or walk for 4 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; was limited in her ability to push or pull in both arms and in her left leg; could occasionally climb ramps or

stairs, stoop, kneel, crouch and crawl; could frequently balance; and could never climb ladders, ropes, or scaffolds. (Tr. 141-142) Dr. Wunsch opined that plaintiff was limited in reaching in front, laterally, and overhead with her left hand and in handling with both hands. (Tr. 143) She also opined that plaintiff should avoid concentrated exposure to extreme temperatures and moderate exposure to vibrations and workplace hazards. (Tr. 143)

### 3. Consulting Psychological Examiner Thomas F. Zeck, Ph.D. – July 2013

As explained above, Dr. Zeck performed a consultative psychological exam of plaintiff following the administrative hearing. (Tr. 734-741) Dr. Zeck diagnosed depressive disorder NOS and BIF with a GAF score of 55. (Tr. 738-39) Dr. Zeck opined that plaintiff would have difficulty in carrying out complex instructions but that she would be able to do simple tasks that could be helpful to an employer. (Tr. 739) Dr. Zeck did not feel that attention and concentration were problem areas for Ms. Malone but she did struggle with rote memory and immediate recall. (Tr. 739) Dr. Zeck felt that plaintiff would have the ability to appropriately react to supervisors and co-workers. (Tr. 739)

### E. Testimonial Evidence

### 1. Testimony of Kim Malone

The full hearing in this matter took place on March 18, 2013. (Tr. 67) Ms. Malone was born on October 3, 1966. (Tr. 72) She was in the special education program at her school and graduated in 1985. (Tr. 73)

Ms. Malone last worked in 2011. She worked part-time for a couple of months earning less than $100 per week. (Tr. 74) Before that, she babysat about 20 hours per week and received $50 per week. (Tr. 74) She also worked part-time at a dry cleaning business in 2010. (Tr. 75)

Ms. Malone testified that she was no longer able to work because her back hurt and she couldn't stand very long. (Tr. 75) She also complained of pain in her hands and shoulders and depression. (Tr. 75-76)

Ms. Malone testified that she was capable of lifting a gallon of milk. (Tr. 76) She believed she was able to walk for approximately five minutes before she would need to sit down. (Tr. 76) She stated that she would be able to stand for about 15 minutes at a time and sit for 20 minutes at a time. (Tr. 76-77)

Ms. Malone testified that she lived in a homeless shelter. (Tr. 77) She was able to follow programs she liked when she watched T.V. (Tr. 78) she was capable of grooming and dressing herself, but wore clothing that did not have buttons or zippers. (Tr. 79) She was able to tie her shoes occasionally. (Tr. 79) Ms. Malone used a cane to help her walk but she had not been instructed to use one by a doctor. (Tr. 81)

### 2. Medical Expert – Cathy Krosky

Cathy Krosky, a medical expert ("ME"), also testified. (Tr. 83-96) Dr. Krosky testified that Ms. Malone had the following impairments: chronic low back pain radiating to the right lower extremity; bursitis in her shoulder and general shoulder problems; carpal tunnel syndrome and pain in her wrists; and De Quervain's tendinitis.

Dr. Krosky testified that none of plaintiff's impairments met or medically equaled any of the listed impairments. Regarding plaintiff's residual functional capacity, Dr. Krosky testified:

> I'm not even sure she could do sedentary work, Your Honor, from looking at these records and from what she has said. I think it would be more an occasional 5 pounds lifting, maybe not even able to do an occasional amount of lifting, maybe less. I think she'd be limit[ed] to sitting, at most, four to six hours. I think standing and walking would be, at most, one to two hours, from what I've read, maybe even not that.

I think it would [be] especially hard for her to lift repetitively because of the shoulders, especially her left shoulder because she's had greatly limited range of motion. And there's a[n] orthopedic doctor that did an exam on her that showed positive impingement signs - - entrapment signs of the left shoulder.

So I don't think she'd be able to do any push or pull motions very well with her shoulders on either side.

And for postural, I don't think - - at the CE, she was unable to squat. So I don't think she has ability to squat. Maybe occasionally stooping. I don't think she can kneel, certainly not crawl because of her knees and back. I don't think she could do ladders, ropes, or scaffolds.

I'm not really sure what is wrong with the knees. So she probably would have little ability to climb even stairs with her knee complaints and with the obesity factor[ed] in. If she could get up and down once a day, that might be it for her.

And for the shoulders, I don't think she could reach overhead at all bilaterally.

And certainly, that left upper extremity, which we have better documentation for, I think maybe just occasionally reaching in all directions with the left. The right shoulder is not as well documented, but she does have decreased range of motion there too. So she might be limited to occasional reaching in all directions with the right upper extremity.

And at the CE, she had markedly decreased strength to grip in the left hand and decreased strength to grip to a lesser extent in the right hand also. So I don't think she's going to do any kind of forceful gripping with her hands.

Also, I don't think she should be around hazardous machinery or unprotected heights or do commercial driving because, on the CE, she couldn't toe walk. She was unsteady on heel walking. And like she's telling us today, she's depending more and more on a cane. I didn't see that in the records, but it seems in keeping with the records that she might need a cane.

(Tr. 89-91)

Dr. Krosky explained that her opinion was based on objective medical evidence - citing a September 8, 2010 record from Dr. Mark Tenholder and an x-ray of plaintiff's left shoulder. (Tr. 91) She also cited plaintiff's consultative exam but admitted that some of the opinions from that exam may have been based on Ms. Malone's subjective complaints. (Tr. 92-93) Dr. Krosky also testified that she felt the severity of plaintiff's left shoulder condition was serious and likely had

continued in severity from the time it was initially reported.  (Tr. 92)  When plaintiff's attorney asked her to clarify her opinion, Dr. Krosky explained that she felt that Ms. Malone would be limited to occasional reaching with both arms.  (Tr. 95)

### 3.  Vocational Expert – Kathleen Reis

Kathleen Reis, a vocational expert ("VE"), also testified at plaintiff's hearing.  (Tr. 96-108)  Ms. Reis considered plaintiff's past relevant work to be laundry presser, and convenience clerk.  (Tr. 98).  For the ALJ's hypothetical questions the VE was instructed to assume an individual the same age as plaintiff who had graduated from high school with the same past relevant work history.  (Tr. 99-100)  For the first hypothetical question, the ALJ asked the VE to consider a person who could lift and carry up to no more than 20 pounds occasionally and 10 pounds frequently; could stand and walk 4 hours in an 8 hour workday; could occasionally bend, stoop, crouch, squat, kneel and crawl; could not climb ladders, ropes or scaffolds; could occasionally push and pull with both arms; could occasionally reach overhead with both arms; could not be exposed to fumes, chemicals, dust, or agricultural or landscaping pollens or extreme heat or cold; could not work in proximity to unprotected heights, dangerous moving machinery or other work place hazards; could not operate a motor vehicle as part of a job; could only do simple tasks; and could only follow simple instructions. (Tr. 100-101)

Considering these limitations, the VE testified that this hypothetical person could not perform plaintiff's past work of laundry presser, but could possibly perform the work of cashier with some modification to the overhead reaching requirement.  (Tr. 101-102)  The VE also believed that this hypothetical individual could perform the job of mail room clerk, with approximately 160,000 such jobs nationally and 4,800 in Ohio.  (Tr. 102)  The hypothetical person could perform the job of office helper with 170,000 national jobs and 5,000 jobs in Ohio.

(Tr. 103)  This individual could also work as a production assembler with at least 356,000 national jobs and 19,000 such jobs in Ohio.  (Tr. 104)  However, because of plaintiff's inability to frequently reach overhead, the VE thought that the number of jobs would be reduced by half. (Tr. 104)  Thus, there would be about 170,000 national jobs and 10,000 in Ohio.  (Tr. 104)  The VE explained that some of her responses were based on her own experience and diverged from some of the specifications in the Dictionary of Occupational Titles ("DOT").  (Tr. 105-106)

The ALJ next asked whether the VE's responses would change if the hypothetical individual's ability to stand and walk would be limited to 4 hours in an 8 hour workday.  (Tr. 105)  This additional limitation would eliminate all of plaintiff's past relevant work.  (Tr. 107) This limitation would also restrict the hypothetical person to sedentary work.  (Tr. 105)  In this category, the VE believed the individual could perform the job of food and beverage order clerk with a modification being made for reaching in all directions.  (Tr. 105-106)  She testified that there would be approximately 98,000 jobs in the nation and 1,800 in Ohio.  (Tr. 106)  She also felt that the hypothetical individual could work as a charge account clerk with at least 90,000 jobs in the nation and 2,000 in Ohio.  (Tr. 106-107)  Finally, she believed that the individual would be able to work as a document preparer with 60,000 such jobs in the nation and 1,800 in Ohio.  (Tr. 107)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a).  Furthermore:

[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[1]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,13 claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

Given the nature of plaintiff's arguments, the ALJ's handling of Step Three and Step Five

is in dispute. At Step Three, the ALJ considers the medical severity of the impairment. 20

C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the impairment meets or equals one of the

Social Security Listings and meets the durational requirement, then the ALJ must find the

claimant disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Otherwise, the ALJ will

assess the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

At Step Five, the ALJ considers the assessment of the residual functional capacity, along with

the claimant's age, education and work experience, to determine whether she can make

adjustments to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she can make

adjustments to other work, then the claimant will be found not disabled. 20 C.F.R. §§

404.1520(a)(4)(v), 416.920(a)(4)(v). *See also, Smith-Johnson v. Comm'r of Soc. Sec.,* 579 Fed.

Appx. 426, 2014 U.S. App. LEXIS 17442 (6th Cir. 2014).

**V.     The ALJ's Decision**

The ALJ issued a decision on August 19, 2014. A summary of his findings is as follows:

1. Ms. Malone had not engaged in substantial gainful activity from November 6,
2010, the alleged onset date, through the date of the ALJ's decision. (Tr. 128)

2. Ms. Malone had the following severe impairments: degenerative disc disease
of the thoracic spine with spondylosis at the T11-12 level; acromioclavicular
arthritis and spurring in both shoulders, the left worse than the right, obesity,
adjustment disorder with depressed mood, borderline intellectual functioning
and marijuana abuse. (Tr. 28-29)

3. From November 6, 2010 through the date of the ALJ's decision, Ms. Malone
did not have an impairment or combination of impairments that met or
medically equaled the severity of one of the listed impairments. (Tr. 31)

4. Ms. Malone had the residual functional capacity to lift and carry up to 10
pounds occasionally and 5 pounds frequently; she could stand and/or walk up
to but no more than 4 hours per 8 hour workday; she could occasionally bend,
stoop, crouch, squat, kneel and crawl; she could occasionally climb steps and
ramps; she could not climb ladders, ropes or scaffolds; she could occasionally

push and pull with both upper extremities; she could occasionally reach overhead with both upper extremities; she could not perform work in an environment where there was exposure to fumes, chemicals, dust, or agricultural or landscaping pollens; she could not be exposed to extreme heat or cold; she could not work in proximity to unprotected heights, dangerous moving machinery or other workplace hazards; she could only do simple tasks and could only follow simple instructions.  (Tr. 35)

5.  Ms. Malone was unable to perform past relevant work.  (Tr. 40)

6.  She was born on October 2, 1966 and was considered a younger individual age 18-44 on the alleged onset date and became a younger individual age 45-49 during the pendency of her claim.  (Tr. 41)

7.  Ms. Malone had a high school education and was able to communicate in English.  However, her education did not provide for direct entry into skilled work.  (Tr. 41)

8.  Transferability of job skills was not an issue because Ms. Malone's past relevant work was unskilled.  (Tr. 41)

9.  Considering Ms. Malone's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could perform.  (Tr. 41)

Based on the foregoing, the ALJ determined that Ms. Malone had not been under a disability from November 6, 2010, the alleged onset date.  (Tr. 41)

## VI.    The Parties' Arguments

Plaintiff argues (Doc. 16) that the ALJ erred at Step 3 of the sequential evaluation because he did not properly consider plaintiff's verbal comprehension index ("VCI") score when he determined that she did not meet Listing 12.05(C).  Plaintiff contends that the Social Security rules allow the ALJ to use the lowest of the valid verbal, performance or full scale IQ scores in assessing disability.  Plaintiff cites a Program Operations Manual System related to the requirements of a consultative examiner's report in support of her argument that the ALJ should have placed more significance on plaintiff's VCI score.

Plaintiff also contends that the ALJ improperly rejected the medical opinions of the state agency physicians and the medical expert who testified at the administrative hearing. She argues that the ALJ erred in failing to assign greater weight to Dr. Krosky's opinion that plaintiff could perform no overheard reaching and only occasional reaching in other directions bilaterally. Plaintiff argues that the ALJ's finding of RFC did not take into account plaintiff's limitations in her ability to reach and is not supported by substantial evidence in the record.

Defendant argues in response (Doc. 18) that the ALJ reasonably determined that plaintiff's impairment did not meet or medically equal Listing 12.05(C). The ALJ's determination that plaintiff fell within the borderline intellectual functioning category was supported by test scores and the opinion of Dr. Zeck.

Defendant also argues that the ALJ's findings concerning plaintiff's residual functional capacity are supported by substantial evidence in the record. Defendant acknowledges that the ALJ's dismissal of the state agency reviewing opinions contradicted agency regulations. Nonetheless, defendant argues that, because the ALJ's RFC finding included greater limitations than the reviewing physicians had assessed, plaintiff cannot show harmful error. Defendant also argues that the ALJ properly limited the weight given to Dr. Krosky's opinion regarding plaintiff's ability to reach overhead because it was based, in part, on plaintiff's subjective complaints. Defendant points to medical evidence in the record where plaintiff reported that shoulder pain she had been having for several months had resolved spontaneously. Defendant argues that the ALJ reasonably accommodated plaintiff's shoulder issues by limiting her overhead reaching and by relying on the testimony of the VE. Defendant maintains that the ALJ's determination of plaintiff's RFC was supported by substantial evidence in the record.

Plaintiff filed a reply to defendant's brief on November 30, 2016. (Doc. # 20) In reply, plaintiff continues to argue that the ALJ was required to consider the VCI in determining whether plaintiff met or medically equaled Listing 12.05(C).

## VII. Law & Analysis

### A. Standard of Review

This court's review is limited to determining whether substantial evidence in the record supports ALJ's findings and whether the ALJ applied correct legal standards. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the

Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether substantial evidence supports the Commissioner's decision, the court must determine whether the ALJ applied correct legal standards. If not, reversal is required. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B.    Whether Plaintiff Met or Medically Equaled Listing 12.05(C)

Plaintiff claims that the ALJ erred at Step Three of his sequential analysis in failing to find that plaintiff met or medically equaled Listing 12.05(C). Listing 12.05(C) is a listing for the mental disorder now known as intellectual disability. See 20 C.F.R. Pt. 404, App. 1, §§ 12.00,

12.05(C). One prerequisite to the evaluation of disability on the basis of a mental disorder is that there must be "documentation of a medically determinable impairment." 20 C.F.R. Pt. 404, App. 1, § 12.00(A). If a medically determinable impairment is found, then it must be evaluated under the relevant listing.

Listing 12.05(C) has two parts. The first part, which is referred to as the "diagnostic definition," requires: 1) significantly sub-average general intellectual functioning; 2) deficits in adaptive functioning; and 3) onset before age twenty-two. 20 C.F.R. Pt. 404, App. 1, § 12.05; *see also Hayes v. Comm'r of Soc. Sec*., 357 F. App'x 672, 675 (6th Cir. 2009). The second part, which is referred to as the "severity criteria" of subsection C, requires: 1) a valid verbal, performance, or full scale IQ of 60 through 70; and 2) a physical or other mental impairment imposing an additional and significant work-related limitation or function. 20 C.F.R. Pt. 404, App. 1, § 12.05(C); *Sheeks v. Comm'r of Soc. Sec.,* 544 F. App'x 639, 641 (6th Cir. 2013).

At her psychological examination with Dr. Zeck after the March 2013 administrative hearing, plaintiff scored 68 on the verbal comprehension portion of the Wechsler Adult Intelligence Scale-IV test, which placed her in the 2nd percentile rank for this category. However, she scored higher on other portions of the test, and Dr. Zeck opined that her intellectual ability was in the borderline range. Nonetheless, plaintiff contends that the ALJ was required to consider the lowest component of the test – her verbal comprehension – and determine that she met or medically equaled the disability described in Listing 12.05(C).

In considering Listing 12.05(C), the ALJ stated:

> For purposes of Listing 12.05C and D, I found insufficient evidence in the record to persuade me that Ms. Malone's IQ was at or under 70. On September 7, 1977, less than one month before Ms. Malone's 11th birthday, she was administered the WISC-III IQ test, an IQ test for children, and the results were a verbal IQ of 71, a performance IQ of 72, and a full scale IQ of 69. On July 2, 2013, Dr. Zeck, as part of his one-time consultative psychological examination of Ms. Malone for the

State agency, administered to her the WAIS-IV IQ test, an IQ test for adults, and the results were a verbal comprehension score of 68, a perceptual reasoning score of 82, a working memory score of 74, a processing speed score of 81, and a full-scale IQ score of 72.

In evaluating the cognitive abilities of an adult, whenever I have both WISC scores obtained when the individual was a child (and WISC is intended for children only) and WAIS scores obtained when the individual was an adult (and WAIS is intended for adults only), I give greater weight to the scores obtained when the individual was an adult. Ms. Malone's attorney representative argued that the results of the two are consistent and show that the severity of Ms. Malone's impairment meets Listing 12.05C. He said, "[t]he lowest customarily-used IQ score is employed with Listing 12.05C." He also said that "Ms. Malone's difficulties writing and reading are explained by the low Verbal Comprehension IQ score." However, his argument regarding IQ scores are [sic] not accurate. What listing 12.05C actually provides is that the Listing is met if, among other things, either the verbal IQ score or the performance IQ score or the full-scale IQ score is at or below 70. Listing 12.05C was written when the commonly used adult IQ test was the WAIS-III. When an adult was administered the WAIS-III, the results consisted of a "verbal IQ" score, a "performance IQ" score and a "full-scale IQ" score. However, the WAIS-III has been superseded by the WAIS-IV. When an adult is administered the WAIS-IV, the only "IQ score" produced is the "full-scale IQ" score. Verbal and performance abilities are measured and scored, but the scores are deliberately not called "IQ" scores. I give great weight and importance to this distinction and to the fact that listing 12.05 still describes all the scores as "IQ". Until the Social Security Administration does something (i.e. either amends the listing or issues a formal ruling) to bring its regulation into line with the current edition of the WAIS test being used for adults, I consider myself bound to apply both the listing and the WAIS scores as they are currently written. In this case, the WAIS-IV full scale IQ score is 72. That score is too high to meet listing 12.05C. That score is within the range to support a conclusion of "BIF". I cannot use the lower verbal comprehension score of 68 obtained in this case to reach a different conclusion because that score was not an "IQ score.

There are two additional reasons why I am concluding that Ms. Malone's impairment is "BIF" that does not meet any of the criteria in listing 12.05. Dr. Zeck, who administered the WAIS-IV IQ test to Ms. Malone and was therefore in the best position to evaluate Ms. Malone while she was taking the test, said that, in his opinion, based upon his examination of Ms. Malone as a whole (and not just the IQ test considered alone), the correct diagnosis was BIF, and I agree. Second, Ms. Malone's overall history over time, including but not limited to her work history, her demeanor during the January 14 and March 18, 2013 hearings, and the content of her testimony during the March 18, 2013 hearing, persuaded me that her cognitive impairments constitute BIF and do not constitute what Listing 12.05 calls "intellectual disability."

(Tr. 33-34)

Plaintiff has failed to demonstrate that the ALJ was required to find that plaintiff met Listing 12.05(C) based on the verbal comprehension component of her WAIS-IV test. The severity criteria of 20 C.F.R. Pt. 404, App. 1, § 12.05(C) is two-fold: 1) a valid verbal, performance, or full scale IQ of 60 through 70; **<u>and</u>** 2) a physical or other mental impairment imposing an additional and significant work-related limitation or function. Thus, even if the undersigned agreed with plaintiff that the ALJ was required to rely on her verbal comprehension score on the WAIS-IV test in determining whether plaintiff met the first part of the severity criteria, she does not point to evidence in the record that established that she has an additional and significant work related limitation or function that precludes her from working, or that she met the diagnostic definition of the Listing.

In *Smith-Johnson v. Comm'r of Social Sec.,* 579 Fed. App'x. 426, 428 (6th Cir. 2004), the claimant obtained a Full Scale IQ score of 76 and a Verbal IQ score of 69. The ALJ had not even evaluated whether she met Listing 12.05(C). On appeal, she argued that the ALJ erred in failing to find that she met Listing 12.05(C). The Sixth Circuit Court of Appeals denied her appeal holding that she had failed to point to specific evidence that she met *<u>all</u>* of the specified medical criteria for the Listing. The court stated:

> A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a "substantial question" as to whether he has satisfied a listing. *Sheeks v. Comm'r of Soc. Sec.,* 544 F. App'x 639, 641-642 (6th Cir. 2013). (finding claimant did not raise a substantial question as to satisfying the listing for intellectual disability where the ALJ's finding of borderline intellectual functioning simply left open the question of whether he meets a listing and where claimant pointed to only a few pieces of tenuous evidence addressing the listing). Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing. See *Sullivan v. Zebley,* 493 U.S. 521, 530, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990). ("For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of the

criteria, no matter how severely, does not qualify."); *Foster v. Halter*, 279 F.3d 348, 354-55 (6th Cir. 2001) (claimant must satisfy the diagnostic description and one of the four sets of criteria); see also *Reynolds v. Comm'r of Soc. Sec.,* 424 F. App'x 411, 416 (6th Cir. 2011) (holding that it was not harmless error for the ALJ to fail to analyze Step Three as to an impairment found to be severe at Step Two where the claimant put forth evidence that possibly could meet the relevant listing). Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three.

Here, the ALJ did not fail to evaluate whether plaintiff met or medically equaled Listing 12.05(C). He considered the results of her WAIS-IV test, Dr. Zeck's diagnosis of borderline intellectual functioning, her overall history, including but not limited to her work history, her demeanor and the content of her testimony during the March 18, 2013 hearing. His determination that she did not meet or medically equal Listing 12.05(C) was based on substantial evidence.

The issues presented in this case are remarkably similar to those in *Peterson v. Comm'r of Social Sec.*, 552 Fed. App'x 533 (6th Cir. 2014). There, as here, the claimant asserted that the ALJ should have found him disabled because he had a performance IQ score of 67 and a full scale IQ score of 66 on one test occasion, and a verbal IQ score of 69 and a full scale IQ score of 70 on another test occasion.[2] Peterson contended that the ALJ should have found him disabled at Step Three, "because he had a Listings level IQ score, and the ALJ had already found that he had a number of severe physical or mental impairments." Id. at 538.

The Sixth Circuit noted that cases in which claimants seek a determination that they have met a Listings level impairment require the use of evidentiary standards that are "more strenuous than for claims that proceed through the entire five-step evaluation." Id. at 539. Claimant must show that he meets all of the diagnostic criteria. "An impairment that satisfied only some of the relevant listing criteria does not qualify, regardless of its severity." Id. The *Peterson* decision

_____

[2] The *Peterson* decision did not specify which IQ test version was used on the two test occasions.

dealt with the very issue presented here: a plaintiff who argued that some of his IQ scores met the Listing 12.05(C) requirement of a valid verbal, performance or full scale IQ score of 60 to 70 but an ALJ who concluded that was not sufficient. The court held: "Substantial evidence in the records exists to support ALJ Zuber's conclusion that Peterson has failed to [show that he met all the requirements of the Listing], although there is likewise sufficient evidence to support that Peterson met the requirement with a full scale IQ score of 70 on one exam." Id.

As in *Peterson,* plaintiff cannot prevail by simply pointing to one component of her WAIS-IV test which she contends relates to one part of the severity criteria of Listing 12.05(C). She has failed to point to specific evidence demonstrating that she reasonably could meet or equal all of the other requirements of the Listing. As in *Peterson*, plaintiff attempts to dismiss the ALJ's handling of other issues pertinent to his Listing analysis. Here, as there, the ALJ noted that plaintiff had never been diagnosed with intellectual disability, but only BIF. And he pointed out that his conclusion was also based on "Ms. Malone's overall history over time, including but not limited to her work history, her demeanor during the January 14 and March 18, 2013 hearings, and the content of her testimony during the March 18, 2013 hearing, persuaded [him] that her cognitive impairments constitute BIF and do not constitute what Listing 12.05 calls "intellectual disability."" (Tr. 34). Thus, even if the court were to accept plaintiff's argument that here 2013 Verbal Comprehension Index score is the equivalent of a Verbal IQ score that alone is not enough.

The undersigned also cannot find that the ALJ used incorrect legal standards in deciding that a Verbal Comprehension Index score from the WAIS –IV IQ test is not an IQ score for purposes of conducting a Listing 12.05(C) analysis. First, the ALJ relied on the unambiguous language of the Listing 12.05, which required: "A valid verbal, performance, or full scale IQ of

60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]"  Second, the ALJ concluded that the WAIS-III IQ test instrument has been superseded by the WAIS-IV, a fact that plaintiff has not disputed.  Third, the ALJ pointed out that the WAIS-IV instrument did away with sub-test IQ scoring that resulted in a Verbal IQ score, a Performance IQ score and a full-scale IQ score.  Plaintiff does not dispute this but points to a Frequently Asked Questions bulletin issued by the publisher of the WAIS-IV indicating that when WAIS-IV scores are used in some settings, including legal proceedings, "[t]he terms VCI and PRI should be substituted for the terms VIQ and PIQ in clinical decision-making and other situations where VIQ and PIQ were previously used."  And plaintiff points to a section from the Social Security Administration Program Operations Manual System that suggests the Verbal Comprehension Index score is one of the "composite scores" that experts commenting on a claimant's mental disorders must include in a report of findings.

Plaintiff made these same arguments to the ALJ in a request to reopen his decision and before the Appeals Council.  Neither found merit in the argument.  The undersigned also finds no merit in this argument.  An ALJ cannot be found to have applied incorrect legal standards when he relies upon and applies the plain language of an unambiguous regulation setting forth the elements of a disability listing.  At best, plaintiff has pointed out an arguable inconsistency between the language of the Listing and the terminology used on an updated IQ test.  As noted by the ALJ, there is no reason to think the test publisher failed to understand the significance of it language it chose to use.  And there is no reason to think the Social Security Administration somehow failed to discern that people who were intellectually disabled might lose their chance for Social Security benefits because of the language change in a testing instrument.  Moreover, recent changes in the Listing 12.05 reveal that the anomaly has largely been eliminated and that

it is clearly the full-scale IQ score that must be considered.[3]   Had the Commissioner thought

sub-test scores were contemplated in the past iteration of the Listing, it would have clarified the

new regulation to include them now.  By doing the opposite, it has made it clear that only full-

scale IQ scores should be utilized.  If Ms. Malone's application were being considered now, she

would not be able to make the argument she now makes.

For these reasons, the undersigned finds that the ALJ did not err in concluding that there

was insufficient evidence to establish that plaintiff met or medically equaled Listing 12.05(C).

### C.      Residual Functional Capacity

Plaintiff also argues that the ALJ's finding of residual functional capacity was not

supported by substantial evidence in the record.  (Doc. 16, p. 18)  Plaintiff contends that the ALJ

did not properly weight the medical opinions in the record and that his analysis was outcome

determinative.  (Doc. 16, p. 19-20)  The undersigned disagrees.

An ALJ's residual functioning capacity determination is proper when it is based upon "all

of the relevant medical and other evidence."  20 C.F.R. § 416.945 (a) (3).  Relative to the

sequential outline, the ALJ determines the residual functional capacity just before deciding

whether the claimant can perform her past relevant work (Step Four) and whether there are other

jobs in the national economy that the claimant can perform.  A claimant is not disabled if she can

---

[3] The current Listing 12.05(B) provides in part:
1.Significantly subaverage general intellectual functioning evidenced by a or b:

  a.  A full scale (or comparable) IQ score of 70 or below on an individually administered
      standardized test of general intelligence; or

  b.  A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ
      score (or comparable part score) of 70 or below on an individually administered standardized
      test of general intelligence;

https://www.ssa.gov/disability/professionals/bluebook/12.00-MentalDisorders-Adult.htm#12_05 (last
visited May 3, 2017).

perform past relevant work.  At the final step, Step Five, the ALJ considers the claimant's residual functional capacity and her age, education, and work experience to determine whether the claimant may work.  A claimant is disabled if she is unable to work or there are no jobs she is capable of performing.  See 20 C.F.R. § 404.1520(a)(4).

At its most basic level, a claimant's residual functional capacity is simply an indication of [her] work-related abilities despite her limitations.  See 20 C.F.R. § 404.1545(a)(1).  The residual functional capacity is not a medical opinion, but an administrative determination reserved to the Commissioner.  See 20 C.F.R. § 404.1527(e)(2).  Accordingly, the ALJ bears the responsibility for determining a claimant's residual functional capacity, based on all of the relevant evidence. See 20 C.F.R. § 404.1545(a)(3).

Under 42 U.S.C. § 405(g), the findings of the ALJ are conclusive if they are supported by substantial evidence.  The substantial evidence standard presupposes that there is a "zone of choice" within which the Agency may proceed without interference from the courts.  *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986).  The ALJ's decision must be affirmed if it is supported by substantial evidence even if the reviewing court would have decided the matter differently and substantial evidence also supports a different conclusion.  *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen*, 800 F.2d at 545.

Plaintiff first complains that the ALJ did not properly analyze the state agency medical experts.  (Doc. 16, p. 19)  In his decision, the ALJ indicated that he had considered the non-examining State agency medical experts.  However, he indicated that he gave their opinions no weight because they had not reviewed all the records and had not seen or heard Ms. Malone. (Tr. 39)  While the ALJ's basis for dismissing these physicians' opinions could be construed as an error because it contradicts agency regulations, he actually determined that plaintiff's residual

functional capacity was *more* restricted than these physicians. Both Drs. Wunsch and Morris-Spears opined that plaintiff had the RFC to perform light-range work (R. 122, 141). The ALJ determined that plaintiff had the RFC to perform only a limited range of sedentary work (R. 35). Thus, the ALJ's rejection of the opinions of the non-examining state agency physicians is, at most, harmless error. The Supreme Court has recognized that "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citing, e.g., *Nelson v. Apfel*, 131 F.3d 1228 (7th Cir. 1997). Citing Congressional intent that reviewing courts not become "impregnable citadels of technicality," the Court warned against use of mandatory presumptions and rigid rules to decide if errors are harmless. *Id*. at 407 (internal citations omitted). Instead, the reviewing court must "directly ask[] the harmless-error question," which forbids "reversing for error regardless of its effect on judgment." *Id*. at 409. Because the ALJ found that plaintiff's RFC was more restricted than had the state-agency reviewing physicians, his assignment of no weight to their opinions was harmless.

Plaintiff also complains that the ALJ failed to assign proper weight to the opinions Dr. Krosky gave at the administrative hearing. Like the other state-agency reviewing physicians, Dr. Krosky only reviewed portions of plaintiff's medical records but did not actually examine Ms. Malone. Plaintiff claims that Dr. Krosky testified that plaintiff could not perform any overhead reaching and only occasional reaching in other directions bilaterally. Plaintiff argues that the ALJ did not cite any evidence which undermined Dr. Krosky's opinion and that he erred in rejecting her opinion. Plaintiff further argues that this error was not harmless because the VE testified that a person limited to occasional reaching in all directions would not be able to

perform the jobs identified. Plaintiff contends that the ALJ's finding of RFC was not supported by substantial evidence in the record.

The ALJ acknowledged Dr. Krosky's opinion that plaintiff could not reach overhead bilaterally and could reach no more than occasionally with individual arms. (Tr. 39) However, he noted the following shortcomings in Dr. Krosky's opinion:

> I note that Dr. Krosky gave weight to records that predated November 6, 2010, the alleged onset date in this case, without noting that records after that date sometimes did not corroborate what the earlier records said. Dr. Krosky did note that some of her opinions were based on objective findings but some were based on Ms. Malone's subjective complaints. For these reasons, I gave no weight to her opinion regarding Ms. Malone's abilities to lift and carry because those are not supported by the objective medical evidence in the record and were at least partially contradicted by Ms. Malone's own hearing testimony, discussed above. * * * I note that Dr. Krosky heard, but did not see, Ms. Malone during the March 18, 2013 hearing, and that Dr. Krosky never saw Exhibits 13F through 17F.

(Tr. 40) Dr. Krosky was not a treating physician and did not examine plaintiff. The ALJ provided a rational explanation as to why he did not give full credit to Dr. Krosky's opinion regarding plaintiff's abilities to reach overhead and in all directions. (Tr. 40) Dr. Krosky based her opinion, in part, on Ms. Malone's subjective complaints and did not review all of her medical records. The ALJ properly considered the opinion of Dr. Krosky in relation to the other medical evidence in forming his RFC finding.

Plaintiff also refers to the opinion of consulting examiner, Dr. Rodriquez, M.D., and notes that her findings with respect to plaintiff's shoulder were "very significant." (Doc. 16, p. 21) The ALJ acknowledged Dr. Rodriquez's opinion but noted that Dr. Rodriquez did not give any actual residual functional capacity opinion related to this "very significant" finding. Thus, it is unclear whether Dr. Rodriquez's opinion even contradicts the ALJ's finding of residual functional capacity. The ALJ's RFC finding included limitations in plaintiff's ability to push and pull and reach overhead with her upper extremities. The ALJ properly considered Dr.

Rodriquez's opinion in relation to the other medical evidence in forming his decision as to plaintiff's residual functional capacity. (Tr. 38)

The ALJ fully considered the medical evidence in the record and noted that plaintiff had complained of shoulder pain in the past which had resolved spontaneously. (Tr. 37) He also noted that she reported tenderness in her left shoulder in December 2010 and her range of motion was decreased. However, her neurological examination was essentially normal. (Tr. 37) The ALJ's finding of residual functional capacity was based on substantial evidence in the record and he was not required to assign controlling weight to the opinion of Dr. Krosky, a non-examining consulting physician, or to Dr. Rodriguez, who did not provide actual RFC opinions.

Finally, plaintiff complains that the ALJ's finding of residual functional capacity was not harmless error because the VE testified that an individual limited to occasional reaching in all directions could not perform the jobs identified. The VE was asked to identify jobs that could be performed by an individual who could only reach overhead occasionally and in all directions occasionally. (Tr. 100) She testified that there were jobs that could be performed by such an individual. (Tr. 102-104) While the VE's testimony regarding the maximum reaching requirement of these jobs was a little confusing, she clearly admitted that her opinion was inconsistent with the maximum reaching qualifications for these jobs in the DOT. (Tr. 106) She further explained that she considered plaintiff's limitation in reaching when she calculated the number of jobs that would be available to the hypothetical individual. (Tr. 104, 107)

Under Social Security Ruling 00-4p, 2000 SSR LEXIS 8, once an ALJ has recognized a conflict between the testimony of a vocational expert and the Dictionary of Occupational Titles, the ALJ must "explain in the determination or decision how he or she resolved the conflict"

before relying on the vocational expert's testimony. *See also, Bryant v. Comm'r of SSA,* 2013 U.S. Dist. LEXIS 137439 at *13-14. (N.D. Ohio, Sept. 3, 2013).

Here, the ALJ noted that the VE's testimony differed from the definitions in the DOT. He stated:

> Ms. Reis said that, according to the DOT, these jobs are usually done in the national economy with a maximum of frequently, not just occasionally, for overhead reaching. Ms. Reis said that the numbers of jobs she gave for those occupations (stated above) are for jobs in which overhead reaching is done no more than occasionally, as provided in the stated residual functional capacity. She acknowledged that her testimony on this point was not consistent with the DOT and said that her testimony on this point was based on her professional knowledge and experience. I find that her professional knowledge and experience are more reliable than the DOT.

As required, the ALJ identified an inconsistency between the DOT and the VE's testimony and determined that the VE's testimony was more reliable. The undersigned finds that the ALJ properly relied on the VE's testimony and that substantial evidence supported the ALJ's finding that there were a significant number of jobs which plaintiff was capable of performing.

## VIII. Recommendations

The court should find that the ALJ properly considered and weighed the evidence, including the medical opinion evidence; that he properly determined that plaintiff did not meet or medically equal the criteria for Listing 12.05(C); and that he properly determined plaintiff's residual functional capacity. The court should further find that substantial evidence supported the ALJ's decision and that Ms. Malone has not demonstrated a basis upon which to reverse or remand the Commissioner's decision. Accordingly, I recommend that the final decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. § 405(g).

Dated: May 4, 2017

Thomas M. Parker
United States Magistrate Judge

_____

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).